# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**TYREE A. POPE,**

    **Plaintiff,**

    v.                                  Case No. 12-CV-331

**NURSE TOMASZEWSKI,**

    **Defendant.**

---

## DECISION AND ORDER

The pro se plaintiff, Tyree A. Pope, is a former Wisconsin state prisoner and has filed this civil rights action pursuant to 42 U.S.C. § 1983. I granted his petition to proceed in forma pauperis on an Eighth Amendment claim that, while incarcerated at the Racine Correctional Institution, defendant Nurse Tomaszewski allowed his painful, bleeding perforated eardrum to remain untreated for six days while it became infected. Plaintiff has filed two motions for reconsideration and the parties have filed cross-motions for summary judgment. For the reasons explained herein, I will deny plaintiff's motions, grant defendant's motion for summary judgment, and dismiss this action.

### PLAINTIFF'S MOTIONS FOR RECONSIDERATION

Plaintiff has filed two motions for reconsideration (ECF Nos. 61, 66) of my decisions denying his requests for pro bono counsel. He asserts that he does not know how to respond to defendant's motion for summary judgment and that he may lose his case if I do not recruit an attorney to represent him.

Plaintiff has filed several motions for pro bono counsel in this case and I have denied each one. My decision that plaintiff is capable of proceeding on his own has not

changed.  He is proceeding on a discrete medical care claim against one defendant.  Some medical claims are complex and require recruitment of pro bono counsel to help a pro se litigant present his claim, understand the claim, and even obtain an expert witness.  See Olson v. Morgan, 750 F.3d 708, 711-12 (7th Cir. 2014); Santiago v. Walls, 599 F.3d 749, 762 (7th Cir. 2010).  This is not one of those claims.  See Romaelli v. Suliene, 615 F.3d 847, 852 (7th Cir. 2010).  Moreover, plaintiff's filings reveal that he is competent to proceed on his own because he understands his claim and ably presents his arguments to the court.  Plaintiff filed an affidavit along with summary judgment response and he also filed his own dispositive motion (which I considered despite its failure to strictly comply with the Local Rules).  The nature of plaintiff's claim and his filings reveal that he is competent to proceed on his own.  Accordingly, plaintiff's motions for reconsideration will be denied.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011).  "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248.  A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

2

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**FACTS**[1]

**A.    Defendant's Facts**

Defendant Elizabeth Tomaszewski has been a registered nurse since 1989. She has worked in various settings, including at hospitals as a psychiatric/mental health nurse, in nursing homes, and as a contract nurse for the Wisconsin Department of Corrections (DOC) at Racine Correctional Institution (RCI). In December 2009, defendant was a contract nurse at RCI based on a placement through Guardian Health Staff, LLC and plaintiff was confined at RCI. Defendant's care and treatment of him took place in RCI's Health Services Unit ("HSU").

Plaintiff underwent a DOC intake screening on September 5, 2007. He reported hearing loss that he associated with a motorcycle accident in 1999. As follow-up to the intake screening, an audiogram was performed on plaintiff on October 2, 2007.

---

[1] Facts are taken from Defendant's Proposed Findings of Fact and plaintiff's affidavit (ECF No. 64, titled "Motion of Testimony") filed in response to defendant's motion for summary judgment.

On November 16, 2009, plaintiff complained of having difficulty hearing due to "long standing hearing loss." (Tomaszewski Decl. ¶ 13, Exh. C.) An audiogram was performed on November 18, 2009. The audiogram form indicates that plaintiff reported his hearing loss in the right ear to be less than in the left ear. An ear exam revealed that plaintiff's right ear canal was clear, but that his left ear canal presented with cerumen (wax). Plaintiff was scheduled for ear lavage (ear flushing).

The lavage process starts with ear drops placed into the ear canal to soften the wax build-up. After the ear drops are used for several days, the ear is flushed with water inserted through a syringe or tube into the ear canal. The water is allowed to come back out of the ear and the wax is washed out. Defendant learned to perform ear flushing in nursing school and has performed ear flushes repeatedly through her career.

On December 2, 2009, plaintiff underwent the lavage procedure on both of his ears. Defendant used the same procedure for flushing plaintiff's ears that she has used throughout her career. A "large amount" of debris was flushed from both of plaintiff's ears, but more from the left than the right. (Tomaszewski Decl. ¶ 19, Exh. C.) Following the ear flush, defendant looked into both ears and did not see any bleeding or perforations.

The following day, December 3, 2009, defendant saw plaintiff in the HSU for an "ear check." (Tomaszewski Decl. ¶ 21, Exh. C.) Plaintiff stated that fluid with a little bit of blood came from his left ear onto a tissue. Defendant noted that plaintiff, "[s]tates L ear has 'fluid [with] scant blood' noted on tissue." Id. He reported there was no drainage from his right ear. Defendant did not see any fluid or blood actively coming from plaintiff's left ear. Defendant escorted plaintiff to be seen by the on-duty nurse practitioner right away. The nurse practitioner wrote an order for amoxicillin and ear drops.

On December 4, 2009, plaintiff returned to the HSU complaining of "more drainage left ear, and increased pain and headache." (Tomaszewski Decl. ¶ 24, Exh. E.) Defendant took plaintiff to see one of the HSU physicians, Dr. Luy, who saw plaintiff and noted that the tympanic membrane was intact. Dr. Luy ordered Ibuprofen to alleviate pain. He also continued the treatment with antibiotics and ear drops.

Defendant reinforced with plaintiff the need to keep cotton in ears to help hold in the ear drops, and that there might be increased drainage if the ear drops came out. Defendant advised plaintiff to return to the HSU if he had an increase in symptoms or ran a fever. Defendant did not see or treat plaintiff in any way after December 4, 2009. Even though defendant was not in the HSU on plaintiff's return visits, he received care from the other healthcare providers at the RCI HSU.

On December 5, 2009, plaintiff returned to the HSU and continued to complain of pain and bloody drainage from his left ear. Upon exam, the nurse was unable to discern if the membrane was present, and noted that "light does reflect." (Tomaszewski Decl. ¶ 31, Exh. G.) The on-call physician was paged and diagnosed "acute traumatic ear perforation." The doctor prescribed Vicodin for three days or until Mr. Pope could be seen by an onsite physician.

On December 6, 2009, plaintiff was seen in the HSU again and had a temperature of 97.4 degrees, which is normal. The nurse was not able to visualize the tympanic membrane. It was noted that plaintiff would follow up the next day.

On December 7, 2009, plaintiff was seen again in HSU. His temperature was 97 degrees – again normal. The nurse was able to visualize the tympanic membrane and noted that the "canal no longer near occlusion of white matter." (Tomaszewski Decl. ¶ 33,

Exh. H.) The nurse's plan was to advise the nurse practitioner to evaluate plaintiff when available. When the nurse practitioner saw plaintiff later on December 7, 2009, she noted that he had increased pain over the weekend and was started on Ibuprofen and Vicodin. On exam, he was afebrile, meaning he was not running a temperature, the left ear was "improved" and there was no "obvious purulent drainage." (Tomaszewski Decl. ¶ 34, Exh. I.) The nurse practitioner recommended continued observation, ibuprofen and pain medication, with a follow-up appointment in one week.

On December 8, 2009, plaintiff had a change in his symptoms. He reported increased drainage from his left ear and mastoid tenderness, which had not been present the prior day. It was determined that plaintiff required urgent care at an off-site health facility and he was transported to a local emergency department.

D. Keith Ness, M.D. is a family practice specialist with thirty-six years of experience. In addition to practicing medicine in a clinic and hospital setting, Dr. Ness has worked as a physician at the Juneau County Jail and served as the Medical Director of the Sand Ridge Secure Treatment Center from 2001 until his retirement at the end of 2013. He still provides direct medical care as a part-time physician at Sand Ridge. Dr. Ness reviewed plaintiff's DOC medical records to evaluate the care and treatment provided at RCI and medical records from other facilities related to plaintiff's hearing loss. Dr. Ness opines that the care and treatment provided to plaintiff was appropriate. Dr. Ness's report states that the infections were diagnosed promptly. The infections were then evaluated and treated at the correctional facility with cultures, ear drops, oral antibiotics, and analgesics. When plaintiff's infections did not respond to these initial treatments, he was referred to a local

hospital. Plaintiff was treated promptly and correctly for the perforation and infections with complete resolution of both.

As discussed and explained in Dr. Ness's expert report, none of plaintiff's current ear symptoms are related to the tympanic membrane perforation of December 2009 and subsequent infections. The tympanic membrane perforation and subsequent infections did not exacerbate or accelerate the progression of his pre-existing hearing loss. The last audiogram in the records dated September 23, 2013 shows bilateral severe hearing loss unchanged from the audiogram of November 18, 2009, which predated the tympanic membrane perforation. Plaintiff's medical records show complete healing of the tympanic membrane and complete resolution of the infection.

### B. Plaintiff's Affidavit

Plaintiff's affidavit filed in response to defendant's motion for summary judgment sets forth his version of the events surrounding his claim. I will quote most of his affidavit:

> Prior to December 2, 2009 I filled out a Health Service Unit (HSU) slip to see someone about my ears feeling clogged. I was called to HSU where I was seen by a nurse who determined that I had wax buildup and scheduled me to have my ears flushed. On December 2, 2009 I was called to HSU to have the procedure done by Nurse Tomaszewski. As the procedure started Nurse Tomaszewski told me to hold some type of device under my left ear and she held a different device that she inserted into my left ear and in that moment I felt the worst pain that I've ever experienced in my ear. Blood and fluid came out of my nose, mouth and ear. Nurse Tomaszewski didn't seem like that was unusual because she wanted to proceed to my right ear and I said no because the pain that I was feeling was unbearable that I was in tears. Nurse Tomaszewski gave me some cotton balls and told me to keep them in my ear to stop the drainage. I arrived back to my room and for the next four or five days I went back and forth to HSU because the pain and the drainage wouldn't stop with just cotton balls like Nurse Tomaszewski said. On December 8, 2009 I was sent to the hospital (Wheaton Franciscan Healthcare) where I was seen by a Doctor and it was determined that my eardrum was perforated and I had an ear infection. I was hospitalized for five days. When returning back to Racine Correctional I was still in some

7

pain but with medication that helped me control the pain. On December 28, 2009 I returned to Wheaton Franciscan Healthcare for a follow up visit and was told that I still have an ear infection.

(ECF No. 64 at 1-2.)

## ANALYSIS

Plaintiff filed a motion for summary judgment which is titled "dispositive motion." He asserts that defendant perforated his left eardrum on December 2, 2009, and that an infection set in because he was not treated until six days later when he was taken to the hospital. Plaintiff filed attachments to his motion consisting of records from his visit to the Emergency Room followed by his transfer to the hospital. These documents are not authenticated. However, I have reviewed them anyway. Even if I did consider the documents on summary judgment, they do not establish that defendant was responsible for any delay in treating plaintiff's ear or that she acted with deliberate indifference to plaintiff's serious medical needs.

Defendant filed a motion for summary judgment in which she contends that plaintiff did not present with a serious medical need on December 2, 2009. Defendant further contends that even if the analysis is whether plaintiff's ear pain in the days after the ear flush was a serious medical need, there is no evidence to show that she was deliberately indifferent. Plaintiff's response to defendant's motion for summary judgment states in relevant part:

> I'm not stating that Nurse Tomaszewski did anything deliberately I'm not an expert but to the best of my knowledge when having your ears flushed it doesn't result in a perforated eardrum. Due to Nurse Tomaszewksi negligence I was in pain for weeks. I now have to wear a hearing aid for the rest of my life.

(ECF No. 63 at 2.)

8

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009); see also Estelle v. Gamble, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. Arnett, 658 F.3d at 750 (citing Estelle, 429 U.S. at 104). Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. Id. at 750 (citation omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." Rodriguez, 577 F.3d at 828 (quoting Estelle, 429 U.S. at 103).

A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011) (quoting Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." Id. (quoting Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. Id. at 861 (citing Edwards v. Snyder, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a

prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue – the sorts of ailments for which many people who are not in prison do not seek medical attention – does not by its refusal violation the Constitution." Gutierrez v. Peters, 111 F.3d 1364, 1372 (1997) (quoting Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996)).

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. Elyea, 631 F.3d at 857. Deliberate indifference "is more than negligence and approaches intentional wrongdoing." Arnett, 658 F.3d at 759 (quoting Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir. 1998)).

As a medical professional, defendant is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under [the] circumstances" at issue. McGee v. Adams, 721 F.3d 474, 481 (7th Cir. 2013) (citing Elyea, 631 F.3d at 857). When a medical professional acts in her professional capacity, she "may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. (quoting Elyea, 631 F.3d at 857). "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." Duckworth, 532 F.3d at 679; see also Greeno, 414 F.3d at 653 ("neither medical

malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference").

In this case, the record reflects that the December 2, 2009, eardrum perforation was, at most, negligence. The record also reflects that the day after the eardrum perforation, defendant referred plaintiff to a nurse practitioner who prescribed amoxicillin and ear drops. The day after that, defendant referred plaintiff to Dr. Luy. Defendant had no involvement with plaintiff's treatment after she referred him to Dr. Luy on December 4, 2009. Plaintiff received daily medical care until his December 8, 2009, transfer to the emergency room and hospital.

There is nothing in the record to support a finding that defendant's actions were so far afield of accepted professional standards as to raise the inference that they were not actually based on medical judgment. See Arnett, 658 F.3d at 758-59 (citing Duckworth, 532 F.3d at 679; cf. Gil, 381 F.3d at 663 & n.3 (finding deliberate indifference where the prison doctor prescribed a drug that worsened inmate's condition because the appropriate drug was not part of the BOP's formulary); Greeno, 414 F.3d at 654 (finding deliberate indifference where medical defendants would not alter Greeno's course of treatment over a two year period even though his condition was getting worse and he was vomiting on a regular basis and the defendants nevertheless persisted in a course of treatment known to be ineffective). Accordingly, defendant's motion for summary judgment will be granted.

**THEREFORE, IT IS ORDERED** that plaintiff's dispositive motion (Docket # 50) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment (Docket # 51) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for reconsideration (Docket # 61) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for reconsideration (Docket # 66) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 3rd day of March, 2015.

                                                s/ Lynn Adelman
                                                _____
                                                LYNN ADELMAN
                                                District Judge